IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| | ) | Docket No. 3:21cr240 |
| TERRELL DEVON FREEMAN, | ) | |
| Defendant. | ) | |

Terrell Freeman led a criminal conspiracy that sought to steal a lot of money through fraudulent means. His prior criminal history is consistent with the role he played in this crime as well. He does not appear before this court arguing that either of those two factors should be minimized and he is fully prepared to receive a long sentence. That said and for the reasons outlined below, a shorter sentence than that called for in the PSR is warranted.

DOWNWARD VARIANCE FOR 'LOSS AMOUNT'

The parties agree on the following aspects of 'loss' as they relate to this scheme:

- Approximately $4,500,000 worth of checks were stolen. They are a fair way of tabulating the amount of pecuniary harm which Mr. Freeman and his co-conspirators sought to inflict on the victim companies, thus 18 points are properly assessed under U.S.S.G. §2B1.1(b)(1)(J).

- At the time of his arrest, Mr. Freemen had approximately $1,500,000 in stolen checks in his car. The majority of them were several months old.

1

- Slightly over $3,000,000 worth of checks were deposited (or attempted, but rejected for deposit) into fake bank accounts in an attempt to later withdraw the funds and steal the money.
- A small percentage of the deposited checks resulted in successful withdrawals. The documented losses for restitution purposes is $394,000, but there are probably some additional losses which might bring the successful thefts somewhat over $500,000.

Embedded in these facts are two bases for a 2-point downward variance on 'loss.' First, the old checks in Mr. Freeman's possession at the time of his arrest were never going to be deposited. Opening a new commercial bank account with a months-old check would be a red-flag that no bank would miss. Letting them age after stealing them meant that they would never be used. Likely for many reasons, Mr. Freeman and his co-conspirators had passed on the opportunity to steal that money. Subtracting that $1,500,000 from the total of stolen checks ($4,500,000) brings the actual attempts to steal money below the Guideline threshold of $3,500,000.

Second, this scheme was one where the known success rate was very low. While over $3,000,000 worth of checks were deposited, the conspirators were only able to withdraw and pocket a small percentage of that sum. Like a mass marketing fraud where hundreds of thousands of emails are sent out hoping to bilk a few recipients out of some bogus "fee" or make some phantom "purchase," it was not possible or expected that many of the attempts to withdraw the deposited checks would be successful. The real success rate was not more than 20%, making Mr. Freeman and his co-conspirators actual ability to steal most of the money they took to banks impossible. In essence, the 'loss' calculation marginally overstates the seriousness of the conduct.

With a 2-point downward variance, Mr. Freeman's would be sentenced based on a Level 28 and the Guideline range would be 130-162.[1]

## THE FACTS OF THE CASE ARE NOT AGGRAVATED

Beyond the 'loss' calculation, the rest of the Guideline factors fully capture the seriousness of the case and Mr. Freeman's criminal history. It might be tempting to consider the overall facts as justifying a sentence high in the Guideline range, but every factor that makes this offense more serious has added points and increased the Guideline range.

It was an extensive criminal conspiracy, but the loss amounts and enhancement for 'more than 10 victims' incorporate the broader scope of the crime and translate into 1 ½-2 years more prison time. Mr. Freeman was arguably the top of this conspiracy which resulted in his receiving the maximum role enhancement and at least 3 years more time. Some individuals' identities were used to commit the crime and though it did not result in direct pecuniary harm, it does harm their reputation and potentially their credit. For that, Mr. Freeman's Guideline range is increased by more than a year.

His criminal history drove him across the Sentencing Table and increased his sentence by 3–4 years from that of someone with a petty record. The need for the sentence to reflect the problem that he committed this offense while under another sentence is also reflected in this Guideline range. Those 2 additional PRL points moved him from a PRL IV to PRL V.

Mr. Freeman's willingness to admit his conduct and plead guilty was communicated to the Government not long after arraignment (though administrative matters and scheduling caused

---

[1] The Government has informed counsel that it is withdrawing its argument that the facts support 2 additional points for 'theft from another' and 2 points for 'risk of death or serious bodily injury.' Counsel agrees that they are not applicable.

3

the plea agreement to be filed 2 months later). He fully accepted responsibly and never put the Government to any proofs. Such cases are not common and when deciding where within the applicable Guideline range to sentence, that high level of acceptance of responsibility is often rewarded with a sentence at the bottom. We would argue, however, that there is reason to vary down somewhat more. (See the contemporaneous Memorandum filed under seal.)

## UPDATES TO "PENDING CHARGES" AND PERSONAL HISTORY

The PSR set forth a list of pending charges in Paragraphs 62-68. In recognition of the impact of pending charges on BOP classification and programming, counsel undertook to resolve those pending charges.

Paragraph 62: Mecklenburg County false pretense and identity theft charges under 18CRS244284, 244285, and 244286 have been dismissed. See Exhibit 1.

Paragraph 63: Mecklenburg County false pretense and identity theft charges under 19CRS10270, 10271, and 10272 have been dismissed. See Exhibit 2.

Paragraph 65: Mecklenburg County driving charges under 20CR733785 have been dismissed. (The Clerk's office does not have a copy of the long-form dismissal and counsel is attempting to get a copy of the AOC screen containing the only record of the dismissal.)

Paragraph 66: York County, SC domestic violence charge under 2021GS4601659 are erroneously attributed to Mr. Freeman in the PSR. Assistant Solicitor, Jessica Russo, has confirmed that he is not the defendant in that case. See Exhibit 3 (8/23/22 email).

Paragraph 67: Spartanburg County bank fraud and false police report charges under 2021GS4201940 and 2021A4210201290 have been dismissed. See Exhibit 4.

Paragraph 68: York County, SC bank frauds under 2021GS4601776, 4601777, and 4601779 have been dismissed. <u>See</u> Exhibit 5.

Paragraph 84: Union County, NC unserved warrants for false pretense and conspiracy under 21CRS50414 have been dismissed. <u>See</u> Exhibit 6.

Paragraph 91: Mr. Freeman became a first-time father this year. Kyrie Lee was born February 20th to Tyekia Lee, who he had split with a few months before his arrest. He has had video and in-person visits with Kyrie since his birth. Blessings often coming in pairs, Mr. Freeman also has a baby girl Alexis Campbell, who was born on April 23rd to Alexis Campbell. He has had video visits with them since the birth as well.

Respectfully submitted, this the 14th day of September, 2022.

_____
/s/ANTHONY G. SCHEER
Attorney for the Defendant
Rawls, Scheer, Clary & Mingo, PLLC
1011 E. Morehead St.
Suite 300
Charlotte, North Carolina 28204
(704)-376-3200
tscheer@rscmlaw.com